UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STARYL DESIDERIO,

                   Plaintiff,

     – *against* –

HUDSON TECHNOLOGIES, INC. *and*
BRIAN COLEMAN,

                  Defendants.

**<u>OPINION & ORDER</u>**

22-cv-00541 (ER)

---

<u>RAMOS, D.J.</u>:

       Staryl Desiderio, a former employee of Hudson Technologies Company ("Hudson"), brings this action pursuant to the Americans with Disabilities Act ("ADA"), Title VII, the Family and Medical Leave Act ("FMLA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). First Amended Complaint ("FAC"), Doc. 44 ¶¶ 48–79.  In short, Desiderio asserts that Hudson and Brian Coleman, president and chief executive officer of Hudson, (collectively, "Defendants") unlawfully terminated her due to her disability, discriminated against her based on her gender, and that Hudson improperly denied her a reasonable accommodation of disability leave, interfered with her right to take leave, and is in breach of contract.[1]  *Id.*  Before the Court is Defendants' motion for summary judgment as to all claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Doc. 52.  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

**I.     BACKGROUND**

    **A.  Factual Background**

       The following facts are undisputed except where otherwise noted.

---

[1] The Court previously dismissed Desiderio's FMLA retaliation claim without prejudice.  Doc. 33. Although the claim is replead as Count II in the FAC, in her opposition to the instant motion, Desiderio confirms that she is abandoning it.  Docs. 61 at 4 n.1; FAC ¶ 53–55.

Desiderio's employment with Hudson began on October 10, 2017, following Hudson's acquisition of her former employer, Airgas Refrigerants, Inc. ("Airgas"). Plaintiff's Local Rule 56.1 Counterstatement of Disputed Facts ("Doc. 63") ¶ 1. A few months after joining Hudson, Desiderio was promoted to Vice President of Purchasing, and subsequently, on March 24, 2021, was promoted to Vice President of Supply Chain Management by Coleman. *Id.*

### 1. *The Wresche Incident*

On June 4, 2021, Breanna L'Teoile, one of Desiderio's direct reports, and Tammy Roundy, a customer service supervisor, reported to Hudson's Human Resources Manager, Nicole Hagan, that they had a discomfiting experience with Chris Wresche, a recent addition to the customer group. *Id.* ¶ 3. Both L'Teoile and Roundy reported that Wresche had made inappropriate comments of a sexual nature, including a remark about naked yoga. *Id.* That evening, Hagan alerted Desiderio to their complaints, which prompted Desiderio to have Hagan investigate further. *Id.* ¶ 4.

The following Tuesday, June 8, 2021, Desiderio alerted Coleman to the incidents. *Id.* ¶ 6. However, Coleman asserts that he did not learn the full extent of the charges until speaking with Hagan later that day. Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("Doc. 55") ¶ 8. Coleman also learned from Hagan that Desiderio still wanted to retain Wresche, despite the allegations. *Id.* ¶ 9.

According to Desiderio, however, because the investigation was still ongoing, she did not have all the facts at the time she met with Coleman. Doc. 63 ¶ 8. Further, Desiderio asserts that she only told Hagan to continue the investigation and had not made a determination regarding Wresche's continued employment. *Id.* Hudson ultimately terminated Wresche.[2]

---

[2] The exact date of Wresche's termination is unclear from the record.

2. *Post-Wresche Reprimands*

The following day, June 9, 2021, Coleman brought Desiderio into a Hudson conference room to discuss the Wresche matter. *Id.* ¶ 11; 62-1 at 35.[3]  Coleman, upset by what he felt was a lapse of judgement on Desiderio's part, raised his voice on multiple occasions. *Id.* ¶ 11.  According to Desiderio, Coleman's statements and actions toward her were abusive, something she had never observed from Coleman either personally or toward other employees.  *Id.* ¶ 12.  In her deposition, Desiderio recounted being "terrified" by Coleman who was "yelling at [her]… completely intimidat[ing her]… [s]tanding over [her]," and "treat[ing her] like… a child."  Doc. 62-1 at 32, 34.  She recalled him saying "I want you to go home and think about what you've done or what you've said."  *Id.*  Desiderio stated that she left the meeting "terrified, shaking, hysterical [sic] crying."  *Id.* at 35.

The following day, Coleman sent an email to Desiderio stating:

> "I don't believe the action, or lack thereof, that you took were the best choices and in the best interest of the Hudson employees or our Company.  Not only did you withhold information pertaining to this investigation from me, you were initially planning to keep this person employed after he violated our Company's anti-harassment policy.  As a senior leader in the organization, I would expect that these types of situations are handled correctly."

*Id.* ¶ 13.  The email went on to impose a three-part action plan on Desiderio:  (1) re-take the anti-harassment manager training, (2) participate in a manager training course, and (3) update her 2021 goals to include behavioral metrics toward improving her managerial skills. *Id.*

According to Desiderio, on the same day, Coleman sent a team-wide email to leadership, which clearly referred to her, stating that "a management-level employee had taken actions that violated our Company's anti-harassment policy," and that he "will not

---

[3] The Court refers to the parties' exhibits using the page numbers as they appear on the Court's electronic case filing system, "ECF."

tolerate members of our leadership team who [] turn a blind eye to such behavior rather than addressing, and remediating, it immediately."  Docs. 61 at 13; 62-10 at 1.

Also in June 2021, Desiderio asserts that there was a significant worldwide inventory shortage of refrigerants resulting in price hikes and inventory depletion.  Doc. 63 ¶ 18.  On June 24, 2021, during lunch, Coleman and Desiderio discussed Coleman's views regarding Desiderio's handling of their inventory shortage.  Doc. 63 ¶ 18.  During the discussion, Coleman stated that he viewed the shortage as a managerial failure, although Desiderio asserts that Coleman would later determine that Hudson's limited inventory space and problems with inventory tracking were the causes.  *Id.*; 54-6 at 11; 61 at 13.

### 3.  Sick Leave

On July 14, 2021, Mr. Desiderio texted Coleman stating that he "just got [Desiderio] to sleep after her crying for hours and having chest pains.  She refused to go to the hospital but I'm taking her there in the morning.  Hopefully she's okay."  *Id.* ¶ 19; 54-6 at 18.  The following day, Mr. Desiderio texted Coleman with an update, reporting that "she [was] physically and emotionally exhausted, and was headed toward a complete breakdown." *Id.* ¶ 20.  The next day, July 16, 2021, he sent a follow-up text letting Coleman know that Desiderio "was ill and would be taking sick leave."  *Id.* ¶ 21.

On July 18, 2021, Mr. Desiderio sent Coleman an email with an attached note from the hospital instructing that Desiderio remain away from work until approved to return by a psychiatrist.  *Id.* ¶ 22; Doc. 54-6 at 25.  In the accompanying email, Mr. Desiderio reported that Desiderio would be undergoing therapy and requested that Coleman "send any other forms that are required" for leave purposes.  Docs. 63 ¶ 22; 54-6 at 25.  The next day, July 19, 2021, Coleman responded, sharing his and Hagan's cell

phone numbers.  Doc. 63 ¶ 22.  Though the parties dispute the exact timing,[4] by the next day, Hagan emailed Mr. Desiderio the FMLA leave forms titled "FMLA Certification of Health Care Provider for Employee's Serious Health Condition," which Desiderio submitted on August 5, 2021.  *Id.* ¶ 23, 24.  Importantly, according to Hudson, due to an oversight, Hagan never notified Desiderio that her FMLA leave had been approved, or when it was set to expire.[5]  Docs. 54-4 at 19; 55 ¶ 25; 62-3 at 22, 23.

On September 30, 2021, Mr. Desiderio emailed Coleman with an update, advising him that he was "told by her current therapist that the thought of returning to work with you terrifies her," expressing uncertainty "that this will ever change," and noting that the therapist "can't predict a return date." *Id.* ¶ 23.  The email goes on to say:  "Under the circumstances, do you think it is best for her to cut ties with the company?  If so, I'm asking that you put together a severance package for her.  Keep in mind that she has already had to burn up her unused sick and vacation time, as well as bearing the burden of uncovered medical costs for past and future treatment." *Id.*  Mr. Desiderio concluded his email to Coleman by stating that Desiderio's "40-year career [had been] destroyed in less than a month" and expressing "hope [that he] will do right by her now." *Id.*  In her deposition, taken March 21, 2023, when asked if she thought that she could have returned to work by July of 2022, Desiderio responded, "I don't believe so, no."  Doc. 54-1 at 72.  She continued that she did not become able, "from a physical and mental standpoint," to return to work until 2023.  *Id.* at 65.

---

[4] Hudson contends that Hagan emailed Mr. Desiderio the FMLA leave forms "[l]ess than an hour" after Mr. Desiderio's July 18, 2021, email request.  Doc. 55 at 23.  However, according to Desiderio and the time-stamped email, the forms were sent the next day, on July 19, 2021.  Docs. 54-6 at 21; 63 at 23.  In any event, the Court finds this discrepancy to be immaterial.

[5] According to the U.S. Department of Labor, the FMLA provides eligible employees with up to 12 workweeks of unpaid leave a year and requires group health benefits to be maintained during the leave as if employees continued to work instead of taking leave.  *See* U.S. Department of Labor, Family and Medical Leave Act (FMLA) https://www.dol.gov/general/topic/workhours/fmla (last visited on August 23, 2024).  The parties do not dispute that Hudson provided Desiderio with the required 12 weeks of unpaid leave, even though Hudson neglected to notify her that the leave had been approved.

Approximately three weeks later, on October 22, 2021, Coleman responded, saying that "we would be willing to provide a three-month severance package. Naturally, the severance benefits would be contingent on Desiderio's execution of a separation agreement including a general release, and other standard provisions." Doc. 62-12 at 1. The same day, Mr. Desiderio emailed Nat Krishnamurti—another Hudson employee— requesting to exercise Desiderio's 23,810 stock options. Doc. 62-13 at 1; 63 at 11, 12. The stock options were issued pursuant to a stock option agreement and governed by "the terms and conditions and subject to all the limitations set forth [t]herein and in the [2014 Stock Incentive] Plan[.]" *Id.* ¶ 29; Docs. 54-6 at 37–40; 62-13 at 1.

On October 27, 2021, Coleman, and not Krishnamurti, responded, explaining that under the 2014 Incentive Plan, a participant who voluntarily terminates employment forfeits all options and that "[b]y failing to return to work upon expiration of her FMLA leave, [Desiderio] effectively resigned her position at Hudson Technologies." *Id.* ¶ 31; Doc. 55 at 30. Coleman noted that Desiderio's intent to terminate her employment relationship with Hudson is "quite clear from the fact that she has requested a severance package," as a consequence, all of her remaining options were cancelled and could not be exercised." *Id.*

However, Desiderio asserts that because she was on disability leave at the time Mr. Desiderio requested to exercise the 23,810 stock options, she still qualified under Section 12(a)(3) of the 2014 Incentive Plan, which provides:

> "all exercisable Stock Options held by the participant on the date of the participant's death or *the date of the termination of his or her employment due to disability*, as the case may be, shall remain exercisable until the earlier of (i) the end of the one-year period following the date of the participant's death or the date of the termination of his or her employment due to disability, as the case may be, or (ii) the date the Stock Option would otherwise expire[.]"

Doc. 54-7 at 68 (emphasis added).

*4.  Chuck Harkins*

 Desiderio alleges that she and former Hudson employee, Chuck Harkins, are materially similarly situated and that he is a proper comparator in connection with her Title VII and NYSHRL discrimination claims.  Doc. 61 at 15, 16.  According to Desiderio, she replaced Harkins as Vice President of Purchasing in June 2018, after he was diagnosed with ALS and became incapacitated.  Docs. 61 at 1; 62-1 at 18–20; 63 ¶ 33.  However, Hudson asserts Harkins never held the position of Vice President of Purchasing; he was the Vice President of Sales & Marketing.  Doc. 66 at 1.  Moreover, according to Hudson, Harkins was a member of a select group of executive officers of its parent company, who, in October of 2006, negotiated a severance agreement providing for, *inter alia*, 18 months of severance pay and other benefits in the event of a disability in exchange for accepting a reduced compensation package.  Doc. 66 at 1.  Hudson maintains that this severance agreement governed Harkins' 2018 severance letter and corresponding benefits when he became disabled.  Docs. 62-17; 64 n.2.  According to Hudson, Desiderio only became a Hudson employee in October of 2017, when it acquired Airgas.  Doc. 66 at 1.  Therefore, Desiderio—like all other Airgas employees— were not parties to the pre-existing executive severance agreement.  Doc. 55 ¶ 34.

In contrast, Desiderio maintains that the 2006 contract that Defendants cite "was not in effect in 2018," as evidenced by the fact that Harkins' severance letter, dated May 18, 2018, makes no reference to the 2006 contract, and contains terms significantly different from the 2006 contract, which was amended in 2008.  Doc. 63 at 33.  For example, in the severance letter, Hudson provided Harkins with 120 days of paid sick leave at his full former salary, a full year bonus based upon his 2016 bonus of $280,000, stock options valued at $302,000, continuation of employer-paid medical and other benefits, and a milestone bonus in the event that Hudson subsequently completed a

transaction that was then pending with Honeywell.[6]  *Id.*; 62-17.  However, the 2006 contract provided for "Sick Pay" at 75% of salary and, according to Desiderio, did not mention a transaction with Honeywell.  *Id.*; 54-8 at 2–17.

### B.  Procedural Background

Desiderio filed the initial Complaint on January 21, 2022, alleging seven claims for relief.  Doc. 5.  On May 12, 2022, Defendant's filed a motion to dismiss ("MTD"), seeking to dismiss the first six counts for failure to state a claim.[7]  Doc. 20.  On January 13, 2023, the Court granted the MTD with respect to Counts Two, Three, and Five, and denied with respect to Counts One, Four, and Six.  Doc. 33.

On March 23, 2023, Hudson filed their Answer to the initial Complaint, Doc. 37, and on June 22, 2023, Desiderio filed a FAC.[8]  Doc. 44.  The Answer was filed on July 5, 2023.  Doc. 46.[9]  The instant motion for summary judgment was filed on September 29, 2023.  Doc. 52.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is

---

[6] There is no further information in the record or the parties' papers regarding any transaction with Honeywell.

[7] In the initial Complaint, Desiderio brought claims against Defendants, alleging (1) interference with, and retaliation for exercising leave rights under the FMLA (Counts One and Two); (2) disability and gender discrimination in violation of NYSHRL (Counts Three and Four) and the NYCHRL (Counts Five and Six); and (3) breach of contract (Count Seven).  Doc. 5.  Count Seven was not at issue in the MTD.  Doc. 20.

[8] In the FAC, Desiderio brought claims alleging (1) interference with, and retaliation for exercising leave rights under the FMLA (Counts One and Two); (2) disability discrimination and failure to accommodate in violation of the ADA (Count Three and Five); (3) gender discrimination in violation of the NYSHRL (Count Four), the NYCHRL (Counts Six), and Title VII (Count Eight); and (4) breach of contract (Count Seven).  Doc. 44.

[9] Discovery was scheduled to be completed by August 14, 2023.  Doc. 48.  At a case management conference held on August 17, 2023, the Court directed parties to promptly produce the remaining documents as narrowed and ordered at the conference, as well as meet and confer, if necessary, to complete discovery.  The parties were further directed to advise the Court by August 31, 2023, as to whether they (1) wished to either be referred to mediation or a settlement conference, or (2) intended to proceed with a motion for summary judgment and, if so, on what proposed briefing schedule.  On August 29, 2023, Defendants submitted a letter proposing a briefing schedule for a motion for summary judgment.

'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Company*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corporation*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

In cases based on allegations of discriminatory retaliation, courts use "an extra measure of caution" in considering summary judgment motions "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 603 (2d Cir. 2006).

### III.    DISCUSSION

#### A.  FMLA – Interference

Desiderio alleges that Hudson interfered with her FMLA benefits.  FAC ¶¶ 49–51.

The FMLA provides that employers may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the statute.  29 U.S.C. § 2615(a)(1).  To this end, "[t]he FMLA 'creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction' should that employer 'interfere with, restrain, or deny the exercise of FMLA rights."  *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (citing *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 724–25 (2003)).  The FMLA entitles eligible employees, like Desiderio, to take a total of 12-weeks of unpaid, job-protected leave in a defined 12-month period for specified family and medical reasons.  29 U.S.C. § 2612(a)(1).

In order to state a *prima facie* case for interference under the FMLA, Desiderio must establish that:  (1) she was an eligible employee under the FMLA; (2) Hudson is an employer as defined by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she gave notice to Hudson of her intention to take leave; and (5) Hudson denied or otherwise interfered with benefits to which she was entitled under the FMLA.  *Graziadio v. Culinary Institute of America*, 817 F.3d 415, 424 (2d Cir. 2016).

The parties do not dispute the first four elements.  Docs. 53; 61 at 5.  However, Hudson contends that there are no disputed material facts sufficient to support the contention that Desiderio was denied benefits to which she was entitled under the FMLA.  Doc. 53 at 11.  Desiderio argues that Hudson interfered with her FMLA benefits by (1) withholding approval of her FMLA leave, (2) "discouraging" her from returning to work, (3) not offering reinstatement of her employment after completing her FMLA leave, and (4) terminating her employment without giving the required notice that she had been formally approved for FMLA leave.  FAC ¶¶ 31, 49, 51; Doc. 61 at 6, 7.

*1. Withholding Approval and Notice*

Desiderio correctly notes that "[w]ithholding approval of FMLA leave []
constitutes FMLA interference in the Second Circuit." *See, e.g.*, *Graziado v. Culinary
Institute of America*, 817 F.3d 415, 425 (2d Cir. 2016)); Doc. 61 at 7.  However, there is
no evidence suggesting that Hudson withheld approval of her FMLA leave.  On July 18,
2021, Mr. Desiderio emailed Coleman, requesting that he "send any other forms that are
required" for requesting leave.  Doc. 63 ¶ 22; Doc. 54-6 at 25.  No later than the next day,
July 19, 2021, Hagan emailed Mr. Desiderio the FMLA leave application.  Doc. 54-6 ¶
23, 24.  Desiderio submitted the FMLA leave form to Hudson on August 5, 2021.  *Id.*
However, due to an oversight, according to Hudson, Hagan never notified Desiderio that
her FMLA leave had been approved, or when it was set to expire.  Docs. 55 ¶ 25; 62-3 at
22, 23.  Accordingly, Hudson argues that their failure wasn't that they withheld approval
of Desiderio's leave, but that they "neglect[ed] to formally notify" Desiderio of her
approved leave.  Doc. 64 at 3.

Courts within this District have "explicitly rejected an independent right of action
for a technical failure to provide notice of FMLA rights, as long as the plaintiff was
ultimately given the leave [] that he requested," as was the case here.  *Amley v. Sumitomo
Mitsui Banking Corporation*, No. 19-cv-3777 (CMB), 2021 WL 4429784, at *12
(S.D.N.Y. Sept. 27, 2021); FAC ¶ 32–33.  To succeed on an FMLA interference claim
where an employee has already taken the twelve weeks of allowed leave, "the employee
must allege that he was actually prejudiced by the violation."  *Fernandez v. Windmill
Distribution Company*, 159 F. Supp 3d 351, 363 (S.D.N.Y 2016); *See Ragsdale*, 535 U.S.
at 90 (holding that the plaintiff must satisfy her "burden of proving any real impairment
of their rights and resulting prejudice").  However, there is no evidence in the record that
suggests that Desiderio was prejudiced by Hudson's failure to provide notice that her
leave had been approved.

In its Opinion and Order, dated January 13, 2023, the Court agreed with Desiderio's assertion that a claim for FMLA interference could lie where, accepting the complaint as true, she may have been able to structure her FMLA leave so that it did not run concurrently with her paid time off ("PTO"), had she been given proper notice. Doc. 33 at 8. Specifically, the Court held that Desiderio could have started her FMLA leave on August 21, 2021, when the PTO expired, and thus extended her FMLA leave until mid-November 2021. Doc. 33. Here—in a footnote—Hudson proffers a Department of Labor ("DOL") opinion letter asserting, *inter alia*, that "an employer may not delay the designation of FMLA-qualifying leave or designate more than 12 weeks of leave… as FMLA leave." Doc. 53 at 14 n.3 (quoting FMLA2019-1-a (Mar. 14, 2019)); Doc. 33 at 8 (citing *Fernandez v. Windmill Distribution Company*, 159 F. Supp. 3d 351 363 (S.D.N.Y 2016)). According to the opinion letter, "[o]nce an eligible employee communicates a need to take leave for an FMLA-qualifying reason [as Desiderio did on July 16, 2021], neither the employee nor the employer may decline FMLA protection for that leave… [consequently], the employer may not delay designating leave as FMLA-qualifying, even if the employee would prefer that the employer delay designation." FMLA2019-1-a (Mar. 14, 2019).

In response, Desiderio contends first, that the opinion letter reinforces her assertion that notice that her FMLA leave had been approved—which Hudson failed to give—was required within five days of being determined, and second, that the DOL opinion letter has since been discredited. Doc. 61 at 7 n.2. Desiderio's initial assertion is unavailing, for, as discussed, the failure to provide notice in this case is insufficient to advance an FMLA interference claim unless Desiderio establishes that she was "actually prejudiced by the violation," which she has not done. *Fernandez*, 159 F. Supp 3d at 363; *see Ragsdale*, 535 U.S. at 90. Additionally, Desiderio's proof that the opinion letter has been discredited is unpersuasive. She relies on a notice on the DOL website stating that "[a]s of January 20, 2021, information in some *news releases* may be out of date or not

reflect current policies." Request an Opinion Letter, U.S. Department of Labor,

https://www.dol.gov/agencies/whd/opinion-letters/request (last visited July 25, 2024)

(emphasis added).  However, that notice does not call into question the ongoing validity

of DOL *opinion letters* because an advisory opinion letter is not just a news release but

"an official written opinion by the [DOL's Wage and Hour Division] of how a particular

law that [they] enforce[] applies in specific circumstances presented by an employer,

employee, or other entity requesting the opinion."  Request an Opinion Letter, U.S.

Department of Labor, https://www.dol.gov/agencies/whd/opinion-letters/request (last

visited July 25, 2024) (emphasis added).  Therefore, an opinion letter would not, on its

face, be affected by the DOL's caution regarding news releases or otherwise be

invalidated.[10]

Accordingly, no reasonable jury could conclude that Hudson interfered with

Desiderio's FMLA benefits by withholding approval of her leave or failing to notify her

that her leave had been approved.

### 2.  Discouragement

Desiderio asserts that Hudson discouraged her from returning to work, in

violation of the FMLA, when Coleman informed her husband, in an October 27, 2021,

---

[10] Desiderio also cites *Lewis v. Boehringer Ingelheim Pharmaceuticals, Inc.* for the proposition that "courts [within the Second] Circuit have found an issue of fact which required denial of summary judgment where [d]efendants put forth no evidence that the leave had been designated FMLA leave, even though the plaintiff took leave longer than 12 weeks."  Doc. 61 at 6 (citing 79 F. Supp. 3d 394, 415 (D. Conn. 2015)). However, Desiderio mischaracterizes the decision in *Lewis*.  In *Lewis*, the court first contemplated two different sick leave periods to determine which one had been designated as FMLA leave.  *See Lewis*, 79 F. Supp. 3d 394.  Regarding the first leave period, from January to August 2008, the court held that there was "no such notice [of designated FMLA leave] in the record[]."  *Id.* at 415.  Regarding the second leave period, beginning in November 2008, the court noted that an FMLA letter had been sent to the plaintiff designating it as FMLA leave.  *Id.*  From these facts, the court determined that only the second leave was FMLA designated and therefore defendants had interfered with plaintiff's FMLA reinstatement rights by not allowing him to return to his job within the designated FMLA leave period, as he had requested and been medically cleared to do.  *Id.* (emphasis added).  However, in the instant case, the record contains no evidence that Hudson failed to designate Desiderio's leave as FMLA qualifying.  In fact, in her deposition, Hagan testified that Desiderio's FMLA leave request had been granted.  Doc. 54-4 at 19.  Additionally, as discussed further in this section, there is no evidence that Hudson discouraged her from returning to work or otherwise interfered with her FMLA benefits.

email, that she had voluntarily resigned by failing to return to work upon the expiration of her FMLA leave. Doc. 61 at 6. Hudson argues that there is no genuine dispute that Desiderio was not denied FLMA benefits because not only did she receive more than the 12-weeks of the FMLA leave that she requested, during her leave there were no disruptions, impediments, or other evidence showing that the leave was inadequate under the FMLA. Doc 64 at 1, 2.

Under the discouragement theory of interference, an employer violates the FMLA by "discouraging an employee from using a leave." *Betances v. MetroPlus Health Plan*, *Inc.*, No. 20-cv-2967 (JGK), 2021 WL 2853363, at *2 (S.D.N.Y. July 7, 2021). "A plaintiff asserting interference on a discouragement theory must offer evidence of acts of discouragement that 'would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights.'" *Nikolakopoulos v. Macy's Inc.*, No. 20-cv-1641 (KPF), 2022 WL 3903595, at *24 (S.D.N.Y. Aug. 30, 2022) (quoting *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009)).

In support of her discouragement theory, Desiderio relies on *Ridgeway v. Royal Bank of Scotland Group*, where the defendant was found to have discouraged the plaintiff from using their FMLA leave when it sent a letter wrongly indicating that plaintiff's FMLA leave had been exhausted. *Ridgeway v. Royal Bank of Scotland Group*, 2012 WL 1033532, at *9 (D. Conn. Mar. 27, 2012). The letter was sent to the plaintiff a month into his 12-week FMLA leave period. *Id.* The Court held that this, *inter alia*, could have prompted Ridgeway to abandon his leave and attempt to return to work prematurely. *Id.*

Here, it is undisputed that Desiderio's husband sent a text message to Coleman on July 14, 2021, to report that he was taking Desiderio to the hospital, Doc. 63 ¶ 19, and again two days later saying that she was ill and would be taking sick leave, *Id.* at ¶ 21. On September 30, 2021, Mr. Desiderio emailed Coleman, saying "[u]nder the circumstances, do you think it is best for her to cut ties with the company? If so, I'm asking that you put together a severance package for her[.]" *Id.* In response, on October

22, 2021, Coleman sent an email offering Desiderio a severance package, *Id.* at ¶¶ 26, 27. That same day, Mr. Desiderio sent Hudson an email requesting to exercise Desiderio's stock options, *Id.* at ¶ 28. Coleman responded to that email on October 27, 2021, explaining that "[b]y failing to return to work upon expiration of her FMLA leave, [Desiderio] effectively resigned her position at Hudson." *Id.* at ¶ 31. At no point during those conversations did Hudson notify Desiderio that her FMLA leave had been approved. *Id.* at ¶ 25.

The October 27, 2021, email—which is alleged to have interfered with Desiderio's FMLA leave—was sent *after* the expiration of the 12-week FMLA leave period, which started July 16, 2021.[11] Accordingly, the October 27, 2021, email does not "suggest that plaintiff or someone in plaintiff's position would be penalized or mistreated for taking leave." Doc. 64 at 2 (quoting *Nikolakopoulos v. Macy's Inc.*, No. 20-cv-1641, 2022 WL 3903595, at *24 (S.D.N.Y Aug. 30, 2022)).

Therefore, the Court finds that no reasonable jury could conclude that Hudson interfered with Desiderio's FMLA benefits by discouraged her from returning to work.

### 3. Reinstatement

In the FAC, Desiderio asserts that Hudson interfered with her FMLA leave rights by not offering to reinstate her position upon completing her FMLA leave. FAC ¶ 51.

Section 2614 provides that "any eligible employee who takes leave under Section 2612 [of the FMLA] … shall be entitled, on return from such leave… to be restored to an equivalent position with equivalent employments benefits, pay, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1)(B). But "the right to reinstatement under the FMLA is not absolute." *Barger v. First Data Corporation*, 851 F. App'x. 278, 280 (2d Cir. 2021); *see Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 174 (2d Cir. 2006). The right is extinguished where "the employee is unable to perform an essential

---

[11] On Desiderio's FMLA leave form, submitted to Hudson on August 5, 2021, Desiderio's doctor indicated that Desiderio was incapacitated due to her medical condition starting July 16, 2021. Doc. 54-6 at 28.

function of her position." 29 C.F.R § 825.216(c). In other words, "if [] an employee after twelve weeks of leave is unable to return to work, the employee no longer has the protections of the FMLA and must look to other sources for any relief or protections." *Roberts v. Health Association*, 308 F. App'x 568, 569 (2d Cir. 2009); *see Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2d Cir.1999) (noting that "[t]he fact that [the employee] was not restored to his position at the end of that 12–week period did not infringe his FMLA rights because it is also undisputed that at the end of that period he remained unable to perform the essential functions of his ... position") (citing 29 C.F.R. § 825.216(d)). The evidence shows that Desiderio did not believe that she could return to work until 2023, more than a year after her leave commenced.[12] Docs. 54-1 at 65, 72; Doc. 62-1 at 81.

In *Roberts v. Health Association*, the Second Circuit held that the district court did not err in granting summary judgment where, although the plaintiff could likely show that the defendant interfered with her FMLA rights, there was no evidence that the violation was prejudicial because plaintiff was medically unable to return to work until after the end of her FMLA leave period. *Roberts*, 308 F. App'x at 569. Desiderio attempts to distinguish *Roberts* by asserting that there, plaintiff's termination was deemed not prejudicial—even though the plaintiff had been fired two weeks before exhausting her 12-week FMLA leave—only because defendant had paid plaintiff for the full 12 weeks of FMLA leave, unlike here. Doc 61 at 8. Not so. The court determined that the plaintiff "was not prejudiced by the early termination" because "her doctor had concluded that she was medically unable to work until [] after the end of her [FMLA leave] period."

---

[12] In opposing the instant motion for summary judgment, Desiderio asserts that she might have been able to return to work by July of 2022, Doc. 54-1 at 72, but according to her March 21, 2023, deposition, when asked if she thought that she could have returned to work by July of 2022, Desiderio responded, "I don't believe so, no." Docs. 54-1 at 72. According to her deposition testimony, she did not believe that she was able, "from a physical and mental standpoint," to work until 2023. *Id.* at 65, 72.

*Roberts*, 308 F. App'x at 569; 29 U.S.C. § 2612(a)(1).  Even still, unlike in *Roberts*, it is undisputed that Desiderio was given her full 12-week FMLA leave.

Relying on *Roberts v. AIG Global Investment Corporation*, Desiderio also contends that although her inability to return to work after the FMLA leave period may be relevant to the amount of damages, it would not be relevant to whether she was denied benefits to which she was entitled under the FMLA, including employment reinstatement. Doc 61 at 7, 8; *See* 2008 WL 4444004, at \*4 (S.D.N.Y. Sept. 30, 2008).  However, in *AIG*, the court distinguished the case before it from *Sarno*—a case cited by Hudson— because the plaintiff in *Sarno* had been granted FMLA leave while the plaintiff in *AIG* had not.  *Sarno v. Douglas Ellman-Gibbons & Ives, Inc.*, 183 F .3d 155, 161-62 (2d Cir.1999).  The court in *AIG* held that *Sarno* made the "unremarkable finding that, [t]he fact that Sarno was not restored to his position at the end of that 12-week period did not infringe his FMLA rights because it is also undisputed that at the end of that period, he remained unable to perform the essential functions of his [former] position.  Thus, under 29 C.F.R. §§ 825.216(d) and § 825.214(b), respectively, the FMLA did not entitle Sarno to be restored to his former position or to any other position."  *AIG*, 2008 WL 4444004, at \*4.  The same is true here.  *AIG*'s discussion regarding the determination of damages was only in the context of the plaintiff being denied "the opportunity to take leave at all" and not their "restoration to a position after taking leave."  *Id.*

Accordingly, no reasonable jury could conclude that Hudson interfered with Desiderio's FMLA benefits by not offering to reinstate her position after her FMLA leave was completed.

### 4.  Termination

Furthermore, as Hudson asserts, any contention that it interfered with Desiderio's FMLA benefits when it allegedly terminated her, Doc. 61 at 13, would be unavailing because "FMLA 'interference' claims are an *ex-ante* remedy to be used where an employer 'has prevented or otherwise impeded the employee's ability to exercise rights

under the FMLA.'" *Fitzgerald v. We Company*, No. 20-cv-5260 (AT), 2022 WL 952963, at *9 (S.D.N.Y. Mar. 30, 2022) (citations omitted).  "In a general sense, an employee brings an "interference" claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA … "Retaliation" claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer ... The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA."  *Woods v. START Treatment & Recovery Centers*, Inc., 864 F.3d 158, 166 (2d Cir. 2017).  Consistent with the *ex-ante* nature of FMLA interference claims, "[s]everal courts in this Circuit have cautioned that claims of this nature should be considered retaliation claims, not interference claims, and must therefore be analyzed under the *McDonnell Douglas* burden shifting framework."  *Nikolakopoulos v. Macy's Inc.*, No. 20-cv-1641 (KPF), 2022 WL 3903595, at *26 (S.D.N.Y. Aug. 30, 2022) (quoting *Lievre v. JRM Construction Management*, LLC, No. 17-cv-4439 (BCM), 2019 WL 4572777, at *16 (S.D.N.Y. Sept. 20, 2019).  As previously mentioned, in her opposition to the instant motion, Desiderio confirmed that she abandoned her retaliation claims.  Docs. 61 at 4 n.1; FAC ¶ 53–55.

As Hudson contends, Desiderio received all of the leave she was entitled to and has not otherwise shown that the leave she received was prejudicially interfered with or inadequate under the FMLA.  Consequently, she has not put forth evidence showing a genuine issue of material fact that she was denied a benefit owed to her under the FMLA and therefore no reasonable jury could find that her FMLA rights were interfered with.  Doc. 64 at 2 (quoting *Nikolakopoulos v. Macy's Inc.*, No. 20-cv-1641, 2022 WL 3903595, at *24 (S.D.N.Y Aug. 30, 2022)).  Therefore, the Court grants summary judgement to Hudson on Desiderio's FMLA interference claim.

**B. Gender Discrimination**

Defendants contend that Desiderio has not met her *prima facie* burden of establishing gender discrimination under Title VII, the NYSHRL, and the NYCHRL. Doc 53 at 17, 18, 20.

*1. Title VII and the NYSHRL*

Desiderio's gender discrimination claims, under Title VII and the NYSHRL, are properly analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Asiedu v. Broadreach Medical Resources*, 19-cv-11825 (ER), 2022 U.S. Dist. LEXIS 165568, at *26 (S.D.N.Y. Sep. 13, 2022). A plaintiff's first step under *McDonnell Douglas* is to establish a *prima facie* case of discrimination. *Banks v. General Motors*, LLC, 81 F.4th 242, 270 (2d Cir. 2023) (quoting *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000)). The burden at this stage "is not onerous." *Id.* (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)). Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse action. *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *McDonnell Douglas*, 411 U.S. at 802). Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination. *Id.*; *Banks*, 81 F.4th at 270–71.

In order to establish a *prima facie* case of discrimination, Desiderio must show that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Ruiz v. City of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)). The Second Circuit has explained that a plaintiff's burden at this stage is *de minimis*. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). Nonetheless, in order to state a *prima facie* case for discrimination, "a plaintiff

must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive," *Bennett v. Watson Wyatt & Company*, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), aff'd, 51 F. App'x 55 (2d Cir. 2002), and "cannot meet its burden through reliance on unsupported assertions," *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995*)*. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Griffin v. Ambika Corporation*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 451–52 (2d Cir. 1999)). "A plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge," is also insufficient. *Fincher v. Depository Trust & Clearing Corporation*, No. 06-cv-9959 (WP), 2008 U.S. Dist. LEXIS 70046, at *8 (S.D.N.Y. Sep. 17, 2008).

It is undisputed that Desiderio, a woman, is a member of a protected class, and that she was qualified for her position as Vice President of Purchasing and later, as Vice President of Supply Chain Management. Doc. 63 at 1, 2. At issue is whether Desiderio has suffered an adverse employment action, and if so, whether that action took place under circumstances giving rise to an inference of discrimination.

*a. Adverse Employment Action*

Desiderio points to two adverse employment actions: Coleman's disciplinary actions against her, and her termination. Doc. 61 at 9, 12.

"An adverse employment action is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Galabya v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir.2000)) (internal quotation marks omitted). It is "a materially significant disadvantage with respect to the terms of [the plaintiff's] employment." *Williams v. R.H. Donnelley, Corporation*, 368 F.3d 123, 128 (2d Cir.2004) (emphasis added) (internal quotation marks omitted). Examples of materially significant disadvantages include

termination, demotion, "a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Galabya*, 202 F.3d at 640.

Desiderio points to four incidents where she was reprimanded by Coleman in an allegedly discriminatory way.  First, on June 9, 2021—when Coleman and Desiderio were discussing the Wresche matter in a Hudson conference room—Coleman, noticeably upset, raised his voice on multiple occasions, Docs 63 at 5; 62-1 at 35.  In her deposition, Desiderio recounts being "terrified" by Coleman who was "yelling at [her]… completely intimat[ing her]… [s]tanding over [her]," and "treat[ing her] like… a child."  Doc. 62-1 at 34.  She recalled him saying "I want you to go home and think about what you've done or what you've said."  *Id.*  Desiderio stated that she left the meeting "terrified, shaking, hysterical [sic] crying."  *Id.* at 35.  There is also evidence to support Desiderio's assertion that the following day, Coleman publicly humiliated plaintiff and undermined her reputation by sending a leadership team-wide email, accusing her of "turn[ing] a blind eye" to inappropriate behavior and "violating the company's antiharassment policy."  Doc. 62-10 at 1.  The same day, Coleman sent an email to Desiderio stating:

> "I don't believe the action, or lack thereof, that you took were the best choices and in the best interest of the Hudson employees or our Company.  Not only did you withhold information pertaining to this investigation from me, you were initially planning to keep this person employed after he violated our Company's anti-harassment policy.  As a senior leader in the organization, I would expect that these types of situations are handled correctly."

Doc. 63 at 7.  The email then directed Desiderio to undergo a three-part action plan:  (1) re-take the anti-harassment manager training, (2) participate in a manager training course, and (3) update her 2021 goals to include behavioral metrics towards improving her managerial skills.  *Id.*  Additionally, a reasonable jury could find that Coleman "humiliated" her when he criticized her management skills and blamed her for inventory shortages, which he later determined were caused by Hudson's limited inventory space and problems with inventory tracking.  Docs. 54-6 at 11; 61 at 13; 63 ¶ 18.

21

"[C]ourts in this circuit have found that reprimands ... and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation," and Desiderio offers no evidence of such negative results here. *Dawson v. City of New York*, No. 09-cv-5348 (PGG), 2013 WL 4504620, at *10 (S.D.N.Y. Aug. 19, 2013) (quoting *Honey v. County of Rockland*, 200 F.Supp.2d 311, 320 (S.D.N.Y.2002)); *Passenger Corporation v. Morgan*, 536 U.S. 101, 122 (2002); *Hill v. Rayboy–Brauestein*, 467 F.Supp.2d 336, 355 (S.D.N.Y.2006) ("micro-management" and "excessive scrutiny" were not adverse employment actions, particularly where plaintiff's only evidence of disparate treatment was "her own perception that she was treated differently"); *Figueroa v. City of New York*, 198 F.Supp.2d 555, 568 (S.D.N.Y.2002) ("[b]eing followed by supervisors is not a materially adverse employment action."); *Morrison v. Potter*, 363 F.Supp.2d 586, 591 (S.D.N.Y.2005) ("being called into supervisor's office to discuss work issues" is not an adverse employment action, even if it causes the employee embarrassment or anxiety). Desiderio's placement on the three-part action plan does not constitute an adverse employment action. *See Rivera v. Greater Hudson Vallery Health Sys. (Now Known as Garnet Health),* No. 21-cv-1324 (NSR), 2023 WL 2588308, at *12 (S.D.N.Y. Mar. 21, 2023) ("[I]t is well established that being placed on a performance improvement plan does not constitute an adverse employment action.") (quoting *Boatright v. U.S. Bancorp*, No. 18-cv-7293 (LJL), 2020 WL 7388661, at *20 n.3 (S.D.N.Y. Dec. 16, 2020), *aff'd*, No. 20—cv-4236, 2022 WL 351059 (2d Cir. Feb. 7, 2022)); *McGrath v. Thomson Reuters*, No. 10-cv-4944 (JSR) (JCF), 2012 WL 2119112, at *11 (S.D.N.Y. Apr. 30, 2012) (collecting cases for the proposition that "[t]he issuance of a performance improvement plan to an employee is simply not an adverse employment action"), *report and recommendation adopted*, No. 10-cv-4944 (JSR) (JCF), 2012 WL 2122325 (S.D.N.Y. June 12, 2012), *aff'd*, 537 Fed. App'x. 1 (2d Cir. 2013) (summary order). There is no evidence that Desiderio lost compensation, was reassigned, had charges

brought against her, or lost promotion or transfer opportunities. Additionally, these incidents, viewed individually or cumulatively, do not result in any materially adverse change in the terms and conditions of her employment. Accordingly, Coleman's reprimands do not constitute adverse employment actions.

However, it is well settled in the Second Circuit that the termination of employment is an actionable adverse employment action. *Kairam v. W. Side GI, LLC*, 793 F. App'x 23, 27 (2d Cir. 2019). Desiderio has proffered sufficient evidence that a reasonable jury could determine that she was terminated. On July 16, 2021, Desiderio's husband informed Coleman that she "was ill and would be taking sick leave." Doc. 63 at 9. On August 5, 2021, Desiderio submitted her FMLA leave form, which Hudson approved. *Id.* at 10. On October 22, 2021—in response to an email from Mr. Desiderio to Hudson requesting to exercise Desiderio's 23,810 stock options—Coleman informed Desiderio, for the first time, that "[b]y failing to return to work upon expiration of her FMLA leave, [Desiderio] effectively resigned her position at Hudson[.]" *Id.* at 11, 12. At no point in Mr. Desiderio's conversations with Defendants did he explicitly say that Desiderio would not return or that she was voluntarily resigning. Additionally, at no point in those conversations did Hudson notify her that her FMLA leave had been approved nor indicate when she should return to work. Doc. 63 at 10. From this, a reasonable jury could conclude that Desiderio did not voluntarily resign and thus, Hudson's October 22, 2021, email constituted a de facto termination of Desiderio's employment sufficient to satisfy a *prima facie* showing of an adverse employment action.

  *b. Evidence of Discrimination*

Under Title VII and the NYSHRL, it suffices "to show that the motive to discriminate was one of the employer's motives, even if the employer had other, lawful motives that were causative of the employer's decision." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (citation omitted). A showing that the employer treated a similarly situated employee differently is "a common and especially effective method" of

establishing a *prima facie* case of discrimination[.]"  *Sollazzo v. Just Salad Restuarant*, No. 15-cv-0252 (ER), 2018 WL 1273661, at *6 (S.D.N.Y. Mar. 5, 2018) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir.2001)).  Employment characteristics which can support a finding that two employees are "similarly situated" include "similarities in education, seniority, performance, and specific work duties," *DeJesus v. Starr Technical Risks Agency, Inc.*, 03-cv-1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004), and similar requirements for skill, effort, and responsibility for jobs performed "under similar working conditions."  *DeJohn v. Wal-Mart Stores East*, LP, 09-cv-01315 (GTS), 2013 WL 1180863, at *6 (N.D.N.Y. Mar. 20, 2013); *see also Graham v. Long Island Rail Road*, 230 F.3d 34, 40 (2d Cir. 2000) ("What constitutes 'all material respects ... varies somewhat from case to case," but "there should be an 'objectively identifiable basis for comparability.'") (citations omitted).  This is generally a question of fact for the jury, but "[t]his rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  *Britt v. Merrill Lynch & Company, Inc.*, 08-cv-5356 (GBD), 2011 WL 4000992, at *6 (S.D.N.Y. Aug. 26, 2011) (quoting C*ine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)) (internal quotation marks omitted).

Desiderio has proffered sufficient evidence that a reasonable jury could conclude that she is similarly situated in all material respects and a proper comparator to her male predecessor, Chuck Harkins, yet was subjected to different treatment.  There is evidence to support the contention that they both held the same title, Vice President of

Purchasing,[13] had an overlap in responsibilities, and reported to Coleman.[14]  Docs. 62-1 at 18–20; 62-3 at 8.  Though they both became ill, Harkins was provided with 120 days of paid sick leave, 18 months in severance at his full, former salary, and other benefits, Doc. 62-17, while Desiderio was denied salary continuation, other disability-related benefits, and was ultimately terminated, allegedly, Docs. 61 at 15, 16; 63 at 13–15.  Accordingly, Desiderio has sufficiently pleaded disparate treatment and thus made a *prima facie* case of discrimination.

Under *McDonnell*, if a plaintiff successfully presents a *prima facie* case of discrimination, the defendant must then rebut the presumption by offering legitimate and non-discriminatory reasons for the adverse employment action.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468-69 (2d Cir. 2001).  "The employer need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior."  *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (emphasis in original).  To satisfy the second step of

---

[13] On March 24, 2021, Desiderio was promoted from Vice President of Purchasing to Vice President of Supply Chain Management, "adding customer service supervision to her previous purchasing management functions.  Doc. 63 ¶ 2.  The Court finds this difference in title and responsibilities to be immaterial given that the additional responsibilities as Vice President of Supply Chain Management only augment those under her former role.  Doc. 63 at 1, 2.

[14] Defendants assert that Harkins is not materially similarly situated and thus not a proper comparator because:  (1) the disability benefits he received under his 2018 severance letter were pursuant to a 2006 severance agreement that he signed as an executive officer of Hudson's parent company, an agreement which Desiderio was not a beneficiary to, and (2) although Desiderio held the position of Vice President of Purchasing, Harkins did not.  Docs. 62-17; 64 8, n.2; 66 at 1.  According to Hudson, Harkins was the Vice President of Sales & Marketing.  Doc. 66 at 1.  As Desiderio contends, there remain material disputes regarding both assertions.  Doc. 61 at 15–18.  For example, Harkins' 2018 severance letter only refers to "a severance agreement," and therefore a reasonable jury could find that agreement was not, in fact, the 2006 agreement Defendants cite.  Doc. 63 at 33.  Additionally, the 2018 severance letter terms differ from the 2006 contract.  Doc. 63 at 33.  For example, Hudson provided Harkins with 120 days of paid sick leave at his full salary, stock options valued at $302,000, continuation of employer-paid medical and other benefits, and a milestone bonus in the event that Hudson subsequently completed the then pending transaction with Honeywell.  *Id.*; 62-17.  Conversely, the 2006 contract, amended in 2008, provided for sick pay at 75% of salary and omitted mention of any transaction with Honeywell.  *Id.*; 54-8 at 2–17.  Likewise, even though Coleman's December 13, 2023, declaration states that Harkins had been the Vice President of Sales & Marketing and not the Vice President of Purchasing, in both his July 14, 2023, deposition and Defendants' own 56.1 statement of undisputed facts, Harkins is described as being the former Vice President of Purchasing.  Docs. 55 ¶33; 62-3 at 5, 6.

*McDonnell Douglas*, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254 (1981). "If the defendant carries this burden of production, the presumption [of discrimination] raised by the prima facie case is rebutted," and "drops from the case." *Id.* at 255, 255, 101 S.Ct. 1089 n.10.

Defendants have proffered a legitimate justification for why they did not discriminate against Desiderio. Defendants simply assert that they did not terminate Desiderio's employment, much less did they do so based on her gender. Based on communications between Mr. Desiderio and Hudson, and Desiderio's failure to return to work at the end of her FMLA-protected leave, Defendants believed she voluntarily resigned. Docs. 53 at 18; 64 at 6. Accordingly, Defendants have introduced evidence that "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original).

At the third step, the burden then shifts back to Desiderio to prove that the employer's stated reason was pretext for discrimination. *Id*.; *Banks*, 81 F.4th at 270–71. However, while a plaintiff may satisfy the third-stage burden under *McDonnell Douglas* by showing that the employer's stated reason was false and just a pretext—or cover—for a discriminatory intent, a plaintiff is not required to demonstrate the falsity of the employer's proffered reason. *Henry v. Wyeth Pharmaceuticals*, Inc., 616 F.3d 134, 156 (2d Cir. 2010). "[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Insurance Company*, 46 F.3d 196, 203 (2d Cir. 1995) (internal quotation marks omitted)). To establish pretext, plaintiff "may instead rely on evidence—circumstantial or otherwise—showing that [her gender] was a motivating

factor" in the decision to terminate her. *Holtz v. Rockefeller & Company*, Inc. 258 F.3d 62, 81 (2d Cir. 2001) (citations and internal quotation marks omitted).

The Supreme Court has held that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 147 (2000). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Clawson v. City of Albany Department of Fire & Emergency*, No. 23-482, 2024 WL 1044531, at *1 (2d Cir. Mar. 11, 2024) (quoting *Reeves, Inc.*, 530 U.S. 133, 147 (2000)) (explaining that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").

Desiderio asserts, as pretext, that "in framing Mr. Desiderio's inquiry into severance as a 'voluntary termination' only *after* he attempted to exercise Desiderio's stock options, Defendants created a post-hoc explanation for their refusal to pay her stock options." Doc. 61 at 18. Indeed, in a September 30, 2021 email, Mr. Desiderio asked Coleman "[u]nder the circumstances, do you think it is best for her to cut ties with the company? If so, I'm asking that you put together a severance package for her[.]" Doc. 63 at 11. In a later response to this email, on October 22, 2021, Coleman wrote that "we would be willing to provide a three-month severance package. Naturally, the severance benefits would be contingent on Desiderio's execution of a separation agreement including a general release, and other standard provisions." Doc. 62-12 at 1. From this, a reasonable jury could infer that as of October 22, 2021, Coleman did not yet believe that Desiderio had voluntarily resigned because they were still negotiating the terms of her resignation. With no further communications between Desiderio and Hudson, that same day, Mr. Desiderio emailed Nat Krishnamurti—another Hudson employee—requesting to exercise Desiderio's 23,810 stock options. Docs 62-13 at 1; 63 at 11, 12. Five days later,

on October 27, 2024, Coleman responded to Mr. Desiderio claiming that Desiderio had voluntarily resigned by failing to return to work upon the expiration of her FMLA leave and therefore "her remaining options were cancelled" and could no longer be exercised. Docs. 63 at 12; 61 at 6. From this—and the fact that Hudson failed to communicate a return date to Desiderio—a reasonable trier of fact could determine that defendant's proffered reasons for terminating her were false and not because they in fact believed that she had voluntarily resigned. Accordingly, Desiderio has put forth enough evidence to withstand summary judgement on her Title VII and NYSHRL discrimination claims.

### 2. NYCHRL

The NYCHRL was "designed to be 'broader and more remedial' than Title VII." *See Hornig v. Trustees of Columbia University*, No. 17-cv-3602 (ER), 2022 U.S. Dist. LEXIS 60683, at *34 (S.D.N.Y. Mar. 31, 2022) (quoting *Davis-Bell v. Columbia University*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012)); *see also Bright-Asante v. Saks & Company*, No. 15-cv-5876 (ER), 2020 U.S. Dist. LEXIS 47354, at *14 (S.D.N.Y. Mar. 18, 2020) (stating that, to defeat summary judgment on an NYCHRL claim, a plaintiff "need only show that her employer treated her less well, at least in part for a discriminatory reason," and an employer "is entitled to summary judgment on this basis only if the record establishes as a matter of law that 'discrimination play[ed] no role' in its actions," even where the employer presents evidence of its legitimate, non-discriminatory motives) (quoting *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013))). Thus, where a plaintiff's claims survive even under the more stringent Title VII standard, they necessarily meet the standard under the NYCHRL as well. *See Hornig*, 2022 U.S. Dist. LEXIS 60683, at *39. Accordingly, for the reasons described above, there remain genuine issues of material fact regarding Desiderio's gender discrimination claim under the NYCHRL.

### C. Failure to Reasonably Accommodate

"Discrimination under the ADA includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (quoting 42 U.S.C. § 12112(b)(5)). Under the ADA [], an employer is required to afford reasonable accommodation of an employee's known disability unless the accommodation would impose an undue hardship on the employer. *Noll v. International Business Machines Corporation*, 787 F.3d 89, 94 (2d Cir. 2015) (citing 42 U.S.C. § 12112(b)(5)(A); N.Y. Exec. L. 296(3)(a)); *Vangas v. Montefiore Medical Center*, 6 F. Supp. 3d 400, 412 (S.D.N.Y. 2014) (citing N.Y.C. Admin. Code §§ 8–107(15)(a), 8–102(18)).

To establish a *prima facie* case of discrimination for failure to accommodate, Desiderio must establish by a preponderance of the evidence that: "(1) she is disabled within the meaning of the ADA; (2) Hudson is a covered entity; (3) she could perform the essential functions of her job with an accommodation; and (4) that Hudson refused to provide such an accommodation despite being on notice." *Fox v. Costco Wholesale Corporation*, 918 F.3d 65, 73 (2d Cir. 2019) (quoting *McBride v. BIC Consumer Products Manufacturing Company, Inc.*, 583 F.3d 92, 96–97 (2d Cir. 2009)); *Nieblas-Love v. New York City Housing Authority*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016); *see also Noll*, 787 F.3d at 94 (ADA and NYSHRL); *Snowden v. Trustees of Columbia University*, 612 F. App'x. 7, 10 (2d Cir. 2015) (summary order) (NYCHRL). The parties do not dispute the first two elements. Doc. 53 at 21–23.

Hudson claims that because Desiderio could not perform the essential functions of her job at the end of her FMLA leave, no reasonable accommodation existed, and even if one did, Desiderio did not formally request one. Docs. 53 at 22; 64 at 9. Desiderio

maintains that reasonable accommodations were available, and that Hudson was on notice regarding her disability, and therefore required to "act proactively and engage in an interactive process [to determine one], even if she didn't request a specific accommodation."[15]  Doc. 61 at 20.

Specifically, Hudson asserts that Desiderio's admitted inability to return to work—until at least January 2023—rendered her unable to perform the essential functions of her job.  Docs. 53 at 21; 54-1 at 65.  The only possible accommodation, therefore, would have been to allow Desiderio an open-ended leave of absence, which employers are not bound to provide under the ADA.  Doc 53 at 21, 22.  Indeed, "[w]here there is no indication of when an employee will return, an employer has no obligation to grant an employee an indefinite leave of absence."  *Caytano*, 2022 WL 2467735, at *6 (quoting *Alston v. Microsoft Corporation*, 851 F. Supp. 2d 725, 733 (S.D.N.Y. 2012). However, Desiderio insists that "it is well established that leave for treatment of a disability and recovery, 'even an extended leave" can be a reasonable accommodation' under the ADA."  Doc. 61 at 19 (quoting *Caytano v. Federal Express Corporation*, 2022 WL 2467735, at *6 (S.D.N.Y. July 6, 2022)); *see also Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 201–02 (S.D.N.Y. 1999) ("It is ... undisputed that the ADA contemplates leaves of absence as a possible reasonable accommodation[.]").

Desiderio admits that she "was unable to return to work as of October 2021, due to her medical condition."  Doc. 63 at 13.  In her deposition, when asked if she could return by July of 2022, she responded, "I don't believe so, no," and stated that she did not become able, from a physical and mental standpoint, to work until 2023.  Docs. 54-1 at 65, 72.  At the earliest, that would have been over 18 months from the start of her leave.

---

[15] In her Opposition, Desiderio asserts that "[d]efendants dispute that [she] made them aware of her need for [an] accommodation in the form of leave[.]"  Doc. 61 at 19.  Hudson makes no such claim.  Hudson only asserts that Desiderio never made such a request formally.  *See* Docs. 64 at 9; 53 at 22.  Therefore, evidence that Hudson was on notice regarding Desiderio's need for an accommodation of leave will not, in itself, create a genuine dispute of material fact sufficient to survive summary judgment on this claim, contrary to Desiderio's assertion.  Doc. 61 at 20.

Even more, during the FMLA leave period, the relevant information given to Hudson regarding Desiderio's return was the July 18, 2021, email from Mr. Desiderio to Coleman, which provided a hospital note instructing Desiderio to remain home until given approval from a psychiatrist, *Id.* at ¶ 22, and another on September 30, 2021, updating Coleman that the therapist "can't predict a return date." *Id*. at ¶ 26. The September 30, 2021, email also mentioned that Mr. Desiderio had been "told by [Desiderio's] current therapist that the thought of returning to work with [Coleman] terrifies her, expressing uncertainty "*that this will ever change*." Doc. 63 ¶ 26 (emphasis added). Based on this, the Court agrees with Hudson's assertion that only an indefinite leave could have accommodated Desiderio's situation. Doc. 53 at 22. However, Hudson was under no obligation to grant any such leave. *Caytano*, 2022 WL 2467735, at *6.

It is also not true that since Hudson was on notice regarding her disability, it was therefore required to initiate an "interactive process" with her to determine a reasonable accommodation. Doc. 61 at 20. Generally, it is true that once an employer has notice of an employee's disability, both parties must engage in an "an informal and flexible 'interactive process' meant to determine whether and how an employer can reasonably accommodate its employee." *Krow v. PineBridge Investments Holdings U.S.* LLC, No. 19-cv-5711 (ER), 2022 WL 836916, at *9 (S.D.N.Y. Mar. 21, 2022) (quoting *Goonan v. Federal Reserve Bank of New York*, No. 12-cv-3859 (JPO), 2014 WL 3610990, at *5 (S.D.N.Y. July 22, 2014)); *see also Brady Wal-Mart Stores, Inc.*, 531 F.3d 127, 135–36 (2d Cir. 2008) (holding that employer was obligated to engage in the interactive process where employee's disability was obvious, even in the absence of a specific request from the employee). "[U]nder certain circumstances, an employer is required to act proactively and engage in an interactive process to accommodate the disability of an employee even if the employee does not request accommodation, *see Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir.2008); *see also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered

entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation."). It is undisputed that Hudson was on notice regarding Desiderio's disability: Desiderio submitted her FMLA leave form, which Hudson approved, and Mr. Desiderio was in communication with Coleman regarding Desiderio's hospitalization and her need for continued therapy. Doc. 63 at 19–26. And as Desiderio contends, and Hudson does not dispute, they did not engage in an interactive process regarding an accommodation of extended leave. Doc. 61 at 20.

However, under the ADA, a failure to engage in the interactive process does not form the basis of a disability discrimination claim in the absence of evidence that a reasonable accommodation was possible. *McBride*, 583 F.3d at 100–01; *see Stevens v. Rite Aid Corporation,* 851 F .3d 224, 231 (2d Cir. 2017) ("An employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal.") (quoting *McElwee v. County of Orange,* 700 F .3d 635, 642 (2d Cir. 20212)). As stated above, based on Desiderio's deposition testimony and information from her therapist, only an indefinite leave could have accommodated Desiderio's circumstances, and Hudson was under no obligation to provide such an accommodation.

Therefore, taking account of all the evidence in the record, the Court GRANTS Hudson's motion as to Desiderio's reasonable accommodation claim under the ADA. Contrary to her contentions, Desiderio has failed to proffer evidence from which a reasonable fact-finder could conclude that an accommodation was available that would have allowed her to perform the essential functions of her job, an omission which is fatal to her accommodation claim. *See Johnson v. L'Oreal USA*, No. 21-cv-2914, 2023 WL 2637456, at *6 (2d Cir. March 27, 2023).

### D.  Breach of Contract

Desiderio claims that Hudson breached their 2021 Non-Qualified Stock Option Agreement when it rejected her request to exercise 23,810 options. Docs. 61 at 22; 63 ¶

28.  In order to state a claim for breach of contract, "a plaintiff must allege four elements: (1) the existence of a contract, (2) performance of the contract by the plaintiff, (3) breach by the defendant, and (4) damages suffered as a result of the breach." *Sharbat v. Iovance Biotherapeutics, Inc.*, No. 20-cv-1391, 2022 WL 45062, at *5 (S.D.N.Y. Jan 5, 2022) (Ramos, J.).  Hudson only disputes that it breached, arguing that Desiderio voluntarily terminated her employment and, thus, her stock options were cancelled.  Doc. 53 at 23, 24.  For the reasons discussed below, there remain genuine issues of material fact as to whether Desiderio was terminated or voluntarily resigned, and thus Hudson is not entitled to summary judgement on Desiderio's breach of contract claim.

### 1. *Employment Termination*

First, there is a material dispute regarding whether Desiderio voluntarily resigned or was terminated.  According to Hudson, based on (1) their communications with the Desiderios, (2) Mr. Desiderio's inquiry into a possible severance package, and (3) Desiderio's failure to report back to work after the completion of her FMLA-protected leave, a reasonable jury must conclude that Desiderio voluntary resigned.  Doc. 53 at 20, 21.  However, for a number of reasons, a jury could also find that there was no voluntary resignation, and thus, that Hudson terminated her employment.  *Id.* at 9.

For example, much of Hudson's evidence supporting Desiderio's voluntary resignation is based on communications between Hudson and Mr. Desiderio.  However, as Desiderio argues, there remains a genuine dispute regarding whether Mr. Desiderio was authorized to speak on her behalf or what, if anything, she knew regarding what Mr. Desiderio was communicating.  Doc. 61 at 10; 63 at 13; 64 at 4, 5.  As Desiderio asserts, "it is well established that an agency relationship between a husband and wife is not presumed based solely upon their marital relationship, and neither spouse is empowered to act as agent for the other simply because they are married."  Doc. 61 at 10 (citing *Wanamaker v. Weaver*, 176 N.Y.  75 (1903; *B-Sharp Musical Productions, Inc. V. Haver*, 899 N.Y.S.2d (App. Term 2010; *Four Winds Hospital v. Keasbey*, 459 N.Y.S.2d 68 (1st

Dep't 1983)).  While it could be argued that Hudson was justified in assuming that Mr. Desiderio was speaking on Desiderio's behalf—he was using her personal email address—the question of whether one's spouse was acting as an agent for the other is ordinarily one of fact for the jury.  *Id.* (citing *Gates v. Brower*, 9 N.Y. 205, 206 (N.Y. 1853); *In re Van Denburgh*, 164 N.Y.S. 966 (3d Dep't 1917)); Doc. 54-6 at 20–25.

Even if it was determined that an agency relationship existed, a reasonable jury could conclude that neither Mr. Desiderio's communications with Hudson nor the severance *inquiry* indicated a voluntary resignation.  As discussed, Mike Desiderio was in contact with Coleman regarding Desiderio's health status staring with his July 14, 2021, text message reporting that he was taking her to the hospital, Doc. 63 at 9.  On July 18, 2021, Mr. Desiderio forwarded Coleman instructions from the hospital that Desiderio remain away from work until she is approved to return by a psychiatrist and requested any required leave forms.  Doc. 63 at 9.  On September 30, 2021, Mr. Desiderio emailed Coleman with an update, advising him that he was "told by her current therapist that the thought of returning to work with you terrifies her," expressing uncertainty "that this will ever change," and noting that the therapist "can't predict a return date."  *Id.* at 11.  He went on to say "[u]nder the circumstances, do you think it is best for her to cut ties with the company?  If so, I'm asking that you put together a severance package for her."  *Id.* In no definitive terms does Mr. Desiderio say that *Desiderio* had voluntarily ended the employment relationship.

Additionally, a reasonable jury could find that Mr. Desiderio's inquiry about a potential severance package was no more than Mr. Desiderio opening the door for discussions regarding a possible resignation or disability-related discharge.  Courts have found that inquiring about a severance package is not, in itself, an offer to resign.  *See Forsythe v. Wayfair Inc.*, 27 F.4th 67, 82 (1st Cir. 2022) (concluding that a reasonable juror could find that plaintiff did not offer to resign while inquiring about a severance package).  Even more, Mr. Desiderio's request for a severance package was conditioned

34

on Coleman's response to whether *he* believed Desiderio "should cut ties with the company." Doc. 63 at 11.

Furthermore, Hudson's argument that Desiderio's failure to return to work at the end of her FMLA leave constituted a voluntary dismissal also presents a material dispute. As both parties agree, Hudson never notified Desiderio that her request to take FMLA leave had been approved or when she was required to return to work. *Id.*; Docs. 61 at 9; 63 at 10.

Accordingly, a reasonable jury could find that Desiderio was terminated and, therefore, that Hudson was in breach of contract by refusing to allow Desiderio to exercise the 23,810 options, pursuant to their agreement.

### 2. *Disability Provision*

According to Desiderio, even if it was determined that she was not terminated by Hudson, her employment ended "due to a disability[,] not a voluntary termination." Doc. 61 at 23. However, Hudson argues that their determination that Desiderio voluntarily resigned is binding under Second Circuit law, unless found to be arbitrary and capricious, which they argue is not the case. Doc. 64 at 10.

Desiderio's unexercised 23,810 stock options were issued pursuant to a stock option agreement and governed by "the terms and conditions and subject to all the limitations set forth [t]herein and in the [2014 Stock Incentive] Plan[.]" Doc. 63 at 29. As Hudson asserts, '[u]nder the heading "Termination of Employment," the 2014 Stock Incentive Plan provides:

> "Except as otherwise expressly provided, a participant whose employment is voluntarily terminated by the participant… forfeits all awards, whether or not vested, exercisable or earned, granted to the participant.'"

Doc. 55 at 30. However, Desiderio asserts that this provision is inapplicable because the end of her termination was due to her disability. Doc. 63 at 30. Instead, Desiderio asserts

that Section 12(a)(3) of the 2014 Incentive Plan should apply.  *Id.*  Section 12(a)(3)

provides:

> "all exercisable Stock Options held by the participant on the date of
> the participant's death or *the date of the termination of his or her
> employment due to disability*, as the case may be, shall remain exer-
> cisable until the earlier of (i) the end of the one-year period follow-
> ing the date of the participant's death or the date of the termination
> of his or her employment due to disability, as the case may be, or (ii)
> the date the Stock Option would otherwise expire[.]"

Doc. 54-7 at 68 (emphasis added).

Hudson's main contention is that "[b]ecause the 2014 Stock Incentive Plan

provides that determinations made by the Compensation Committee [(the "Committee")]

'shall be binding and conclusive on all persons and entities, including participants and

their legal representatives,' Doc. 54-7 at 61, the determination that plaintiff forfeited her

stock options must stand unless arbitrary and capricious." *Id.*  In making this assertion,

Hudson relies on *Welland v. Citigroup, Incorporated*, 116 F. App'x 321, 322 (2d Cir.

2004).  In *Welland*, the Second Circuit affirmed the district court's holding that there was

a reasonable basis on which the defendant's compensation committee could conclude that

there was cause to forfeit plaintiff's unexercised stock options under their stock incentive

plan. *Id.* at 11.  Therefore, the court held that the committee's decision to terminate

plaintiff's stocks options was not arbitrary and capricious. *Id.*

However, although Hudson asserts that "determinations made by the [Committee]

shall be binding[,]" it proffers no evidence that the Committee made the determination to

cancel Desiderio's stock options.  The only evidence referencing the decision to cancel

Desiderio's stock options is Hudson's October 27, 2021 email notifying Mr. Desiderio

that Desiderio's stock options had been cancelled.  Doc. 54-6 at 41.  In regard to the

decision-making process, the email states only that "[w]e have reviewed [Desiderio's]

request" to exercise her stock options but makes no reference to the Committee or

otherwise allows for an inference that the Committee, and not just Coleman, was

involved in the process. *Id.* (emphasis added). Therefore, the Court has no way of determining whether the decision to terminate Desiderio's stock options was made by the Committee, or if it was, whether the Committee appropriately determined that there was cause to forfeit the unexercised stocks options, or if the decision was arbitrary and capricious. *See Welland v. Citigroup, Incorporated*, 116 F. App'x 321, 322 (2d Cir. 2004). Accordingly, there remain genuine issues of material dispute regarding whether Desiderio should have been classified as being voluntarily terminated or terminated due to disability under the 2014 Stock Incentive Plan.

For the reasons discussed above, drawing all reasonable inferences in Desiderio's favor, there remain genuine issues of material fact regarding whether Hudson breached their contract. Therefore, summary judgement on Desiderio's breach of contract claim is DENIED.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED in part and DENIED in part. Specifically, the motion is GRANTED as to Desiderio' FMLA interference and reasonable accommodation claims. The motion is DENIED as to Desiderio's gender discrimination and breach of contract claims. The parties are directed to appear for a status conference at 11:00 A.M. on September 17, 2024, before the Honorable Edgardo Ramos in Courtroom 619 of the United States Courthouse, 40 Foley Square, New York, NY.

It is SO ORDERED.

Dated:    September 3, 2024
        New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.